IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2018 Session

## STATE OF TENNESSEE v. CHRISTOPHER JOEL HARTWELL

**Appeal from the Circuit Court for Blount County**
**Nos. C22683, C22684, C22685, C23659    Tammy Harrington, Judge**

### No.  E2017-00633-CCA-R3-CD

The Defendant, Christopher Joel Hartwell, pleaded guilty in the Blount County Circuit Court pursuant to a negotiated plea agreement in case number C22683 to conspiracy to commit money laundering, a Class C felony, maintaining a dwelling where controlled substances are used, a Class D felony, two counts of possession with the intent to deliver a controlled substance in a drug-free zone, a Class D felony, two counts of possession with the intent to manufacture a controlled substance in a drug-free zone, a Class D felony, and possession of a firearm during the commission of a non-dangerous felony, a Class E felony.  *See* T.C.A. §§ 39-14-903 (Supp. 2013) (amended 2014), 53-11-401 (2008) (amended 2010), 39-17-417 (Supp. 2013) (amended 2014), 39-17-1307 (Supp. 2013) (amended 2014).  The Defendant also pleaded guilty in case number C22684 to the sale or delivery of a controlled substance in a drug-free zone, a Class D felony.  *See id*. § 39-17-417 (Supp. 2013) (amended 2014).  The Defendant pleaded guilty in case number C22685 to the sale or delivery of a controlled substance in a drug-free zone, a Class D felony.  *See id*. § 39-17-417 (Supp. 2013) (amended 2014).  Finally, the Defendant pleaded guilty in case number C23659 to two counts of the delivery of a controlled substance in a drug-free school zone, a Class C felony.  *See id*. § 39-17-417 (Supp. 2013) (amended 2014).  After the appropriate merger of the offenses, the trial court sentenced the Defendant as a Range I, standard offender to an effective five-year sentence of which three years were to be served at 100%.  On appeal, the Defendant contends that the trial court erred by (1) denying judicial diversion, (2) allowing confidential informants to testify at the sentencing hearing, and (3) not requiring the State to produce discovery materials related to the confidential informants.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Robert W. White, Maryville, Tennessee, for the appellant, Christopher Joel Hartwell.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Mike L. Flynn, District Attorney General; and Matthew Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The case arises from the Defendant's manufacturing and distributing stanozolol, a schedule III controlled substance. According to the State's recitation of the facts at the guilty plea hearing,

> [O]n March 20[th] of 2014, this is specifically in regard to C-22683, agents of the Fifth Judicial Drug Task Force did conduct a search warrant on the Defendant's residence. Defendant's residence did abut next to a Blessings Daycare for the purposes of the drug-free zone. In the course of the search warrant, . . . schedule three controlled substances, specifically stanozolol . . . commonly referred to as steroids were found in the . . . Defendant's possession. In addition, [the] Defendant had what is called a pill press used for the manufacture of pills. And he had binders and the drugs in concentrated form for the purposes of making pills for these controlled substances.
>
> During this investigation, . . . account information in [the] Defendant's e-mails were found . . . and they did indicate that the Defendant had been acquiring drugs from an individual in Hangzhou in the People's Republic of China, and that he had been in fact manufacturing them as well. And this would be in regard to the offenses . . . stemming from April 1[st], 2013 to March 31[st], 2014 . . . . [H]e did have other individuals who were working on his behalf in the distribution of these steroids.
>
> As to C-22684, . . . on April 23[rd] of 2013, a confidential informant working at the direction of the Drug Task Force was equipped with an audio and video recording device and did proceed to the Defendant's residence, again located in a drug-free zone, and, at that time, did purchase a schedule three controlled substance from the Defendant. And . . . one of these includes . . . testosterone propionate as a schedule three controlled substance.

In C-22685, . . . four days prior to the one that was previously announced on April 19th of 2013, a confidential informant working at the direction of the Drug Task Force did proceed to the residence of the Defendant, again located within a drug-free zone, and did purchase oxandrolone, a schedule three controlled substance from the Defendant.

And then . . . in C-23659, this was on March 13th, 2014, and this sale also served as the basis of the search warrant that was conducted on March 20th of 2014, Agent Aycocke with the Blount County Drug Task Force did have a confidential informant to purchase controlled substances from the Defendant, specifically this schedule three controlled substance, methandrostenolone[,] and stanozolol, a schedule three substance. Agent Aycocke did observe the Defendant leave his residence . . . and that he did go and drive to a prearranged location set by the Defendant, where the controlled substances were sold. And during the course of that, the Defendant did proceed through a [school] zone.

At the sentencing hearing, the presentence report was received as an exhibit and showed that the thirty-four-year-old Defendant had no previous convictions. Although the report noted that the Defendant had previous arrests in North Carolina, it did not reflect that the Defendant had previous convictions. The Defendant graduated from high school, and he obtained a college degree in 2014. The Defendant reported having excellent overall health, good family relations, and a good childhood. He reported being an "'A and B' honors course student" throughout high school, playing soccer throughout his primary education, and receiving multiple college athletic scholarships. The Defendant admitted periodic alcohol and marijuana consumption as a teenager and said he used steroids from age fifteen until 2013. The report showed that the Defendant had mostly steady employment since 2012 and that, at times, the Defendant had multiple jobs simultaneously.

Blount County Sheriff's Investigator Matthew Gilmore testified that on March 20, 2014, he assisted in executing a search warrant at the Defendant's home, which was located behind a childcare center. Investigator Gilmore said that he video recorded the search, and the recording was received as an exhibit and played for the trial court. The recording showed that the Defendant's property and the daycare facility's property shared a fence and that children were playing outside at the time of the search.

Blount County Sheriff's Officer and Fifth Judicial Drug Task Force Agent Rusty Aycocke testified that before 2014, the Drug Task Force received information that the Defendant was involved in a large-scale steroid distribution operation. Agent Aycocke said that he utilized a confidential informant, who learned about the steroid operation, and that the informant identified Eric McGhee as the Defendant's friend. Agent Aycocke

said that the informant was not able to purchase steroids from the Defendant, that the informant bought steroids twice from Mr. McGhee in 2012, and that the informant learned the Defendant provided Mr. McGhee steroids for sale.

Agent Aycocke testified that in 2013, he told Mr. McGhee about the police investigation, that he told Mr. McGhee that the police had bought steroids from him twice, and that he asked Mr. McGhee to cooperate with the police investigation. Agent Aycocke said that Mr. McGhee cooperated and was never charged with a criminal offense because Mr. McGhee was not a distributor of steroids but was "[m]ore of a sharer." Agent Aycocke said the focus of the investigation was on the "bigger picture, the large-scale distributor" in the area.

Agent Aycocke testified that Alex Spelce was involved with the Defendant in the "steroid distribution business." Agent Aycocke said that after March 20, 2014, he and Postal Inspector Agent Wendy Boles went to Mr. Spelce's home, "laid everything out" for Mr. Spelce, and asked Mr. Spelce to cooperate with the police investigation. Agent Aycocke said that Mr. Spelce cooperated and that as a result, Mr. Spelce was never charged with a crime.

On cross-examination, Agent Aycocke testified that he learned of Mr. McGhee during a 2010 or 2011 "debriefing of another individual," who was not identified, that two controlled drug purchases between the confidential informant and Mr. McGhee were arranged in January and March 2012, and that steroid tablets and injectable-type steroids were purchased. Agent Aycocke recalled that the informant purchased between fifty and 150 steroid tablets and one bottle of injectable steroids. Agent Aycocke said that he spoke to Mr. McGhee in March or April 2013 but that he never promised Mr. McGhee would not be charged. Agent Aycocke said the controlled purchases involving Mr. McGhee were recorded.

Agent Aycocke testified that Mr. McGhee identified Mr. Spelce about one or two months before the search warrant was executed at the Defendant's home. Agent Aycocke said that the Defendant provided initial information about Mr. Spelce at the time of the search and additional information on April 20, 2014. Agent Aycocke said that Mr. Spelce's role in the distribution enterprise included receiving packages of steroids for the Defendant, distributing steroids for the Defendant, giving the Defendant money from the sale of steroids, and transferring money electronically to China at the Defendant's direction. Agent Aycocke said that he confirmed the information provided to him.

Eric McGhee testified that he first met the Defendant in late 2008 through mutual friends and that he bought steroids from the Defendant to aid his weight-lifting activities. He said that steroids were taken in a cycle, during which the substance was taken for four weeks followed by one or two weeks without taking the substance. Mr. McGhee said

that he took about three to five steroid tablets per day and three to four injections when he took the substance. He said that the quantity he purchased from the Defendant depended on the cost and that the transactions were made at the Defendant's home or Mr. McGhee's home. Mr. McGhee said that he began purchasing steroids from the Defendant near the time they met and that he bought steroids from the Defendant for approximately three or four years.

Mr. McGhee testified that Agent Aycocke came to his house and wanted to talk about steroids. Mr. McGhee said that he admitted to Agent Aycocke that he had steroids inside his home for personal use and that he obtained them from the Defendant. Mr. McGhee said that Agent Aycocke asked for his assistance in investigating the Defendant and that Mr. McGhee agreed. Mr. McGhee said that he bought steroids from the Defendant at Agent Aycocke's direction.

Mr. McGhee testified that he provided Agent Aycocke with information about Mike Franklin's supplying the steroids to the Defendant. Mr. McGhee said that he and the Defendant spoke about the Defendant's efforts to sell the steroids, including the price and shipment dates. Mr. McGhee said that the Defendant ordered the steroids, although Mr. McGhee did not know with whom the orders were placed. Mr. McGhee said that the Defendant ordered tablet and injectable steroids, including "Sustanon, Test 250, Test 400[, and] . . . Deca," and paid cash through Western Union. Although Mr. McGhee did not know to whom the Defendant sent money electronically, Mr. McGhee recalled California was mentioned. Mr. McGhee said that the Defendant noted making a lot of money selling steroids and recalled that the Defendant said "HGH was a big seller" and "mention[ed] six figures." Mr. McGhee said that the Defendant paid cash for a boat, a home, vehicles, and clothes. Mr. McGhee said that the Defendant previously lived in North Carolina and that the Defendant reported "some trouble" in North Carolina as a reason he moved to Tennessee.

Mr. McGhee testified that he had either seen or heard the Defendant discuss selling steroids to approximately ten people. Mr. McGhee said that although he heard the Defendant previously mention "ordering powder" to make steroids, Mr. McGhee did not know whether the Defendant manufactured steroids for sale.

On cross-examination, Mr. McGhee testified that he first used legalized steroids from GNC in the early 2000s and that he first began taking "real" steroids in 2005 or 2006. He denied selling steroids and did not recall trading something of value in exchange for steroids. He said that he had only purchased steroids from the Defendant, although he admitted Lee Radford had "picked up" steroids on his behalf.

Mr. McGhee disagreed with Agent Aycocke's testimony that Mr. McGhee had sold steroids. Mr. McGhee clarified, though, that he had "picked . . . up" steroids for his friends. He said he last used steroids on the day Agent Aycocke came to his home. Mr. McGhee said his incentive to work with Agent Aycocke was to prevent being charged with a crime and agreed he had not been charged at the time of the Defendant's sentencing hearing.

On redirect examination, Mr. McGhee clarified that Agent Aycocke stated Mr. McGhee transported steroids through a drug-free zone, that Mr. McGhee transported steroids though the drug-free zone because he was "picking [steroids] up" for other people, and that Mr. McGhee did not profit from the sale. He said that if he were going to buy steroids for his personal use and a friend wanted to purchase steroids, as well, he "pick[ed] up" for the friend at the same time. He said he did this for friends three or four times.

Robert Spelce testified that he had known the Defendant since 2008, that he began purchasing steroids for personal use, and that over time "it grew from there." Mr. Spelce said that during 2008 and 2009, he attended college in Murfreesboro and that he obtained steroids from the Defendant when he returned home from school or through the mail. Mr. Spelce said that he mailed money to the Defendant or deposited money in the Defendant's bank account and that the Defendant mailed him steroids. Mr. Spelce said that the Defendant requested he open a post office box in Murfreesboro because the Defendant wanted a package shipped from overseas to be sent to a post office box, rather than to a street address. Mr. Spelce said that he obtained the post office box and that the package received contained steroids and HCG, a non-steroid substance. Mr. Spelce said that the HCG belonged to him and that the steroids were for the Defendant.

Mr. Spelce testified that he returned to East Tennessee in May 2010 and that he continued purchasing steroids from the Defendant, although Mr. Spelce distributed more items for the Defendant. Mr. Spelce said that he received a "price break" from the Defendant when he purchased larger quantities of steroids. He said that he purchased steroids for five to ten friends and that the Defendant distributed steroids to other people, as well. Mr. Spelce said that the Defendant's brother and Mike Franklin were involved in the Defendant's steroid operation, although Mr. Spelce did not know the extent of their involvement.

Mr. Spelce testified that the Defendant ordered the steroids and that Mr. Spelce received the shipments of steroid tablets and injections at his home address. Mr. Spelce said that he usually paid for the steroids and that he received his money after he sold the steroids. He said that Western Union was used to purchase the steroids from China every six to eight weeks and that each purchase cost approximately $4000. Mr. Spelce said that between 2012 and 2014, he received a letter from the "United States Customs

Department," stating that the agency had confiscated a package and warning him not to "do this again." He said that he told the Defendant no more packages were to be shipped to his home address. Mr. Spelce said that in June 2014, Agent Aycocke came to his home and asked for his cooperation in investigating the Defendant and that Mr. Spelce agreed to cooperate.

On cross-examination, Mr. Spelce testified that as long as he cooperated with Agent Aycocke, "there would be less chance of getting in trouble," although Agent Aycocke made no guarantee. Mr. Spelce agreed he had not been charged with a criminal offense. He agreed he sold steroids to his friends when he lived in Murfreesboro and said he had not sold or used steroids since the Defendant's arrest. Mr. Spelce was grateful for his second chance.

On redirect examination, Mr. Spelce testified that after the police searched the Defendant's home, the Defendant warned him to stop selling steroids and to get the steroids out of Mr. Spelce's home. Mr. Spelce said that he saw the Defendant at Sam's Club at a later date, that the Defendant thought Mr. McGhee was the person who talked to the police, that the Defendant said he was going to burn Mr. McGhee's home, and that the Defendant said he was "still doing it with his dad's computer." On recross-examination, Mr. Spelce testified that he did not know whether the Defendant attempted to harm Mr. McGhee and agreed that the Defendant was not a violent person.

Agent Aycocke testified that he learned of the Defendant's operation in 2009 but that the police investigation did not begin until 2011 or 2012. Agent Aycocke said that the first and second controlled drug purchases occurred in April 2013 and that the third occurred in March 2014.

Agent Aycocke said that he learned during the investigation that the Defendant and Mike Franklin, also known as Big Mike, were business partners "to some degree," that a "controlled delivery" of a package to Mr. Franklin was conducted, and that a search warrant was executed at Mr. Franklin's home. Agent Aycocke said that as a result, the Defendant changed his telephone number and stopped associating with Mr. Franklin, which delayed the police investigation of the Defendant. Agent Aycocke said that the search of the Defendant's home occurred in March 2014 and that police officers found multiple types of steroids throughout the home and documents supporting the sale and the manufacture of steroids. Agent Aycocke stated that a pill press, raw active ingredients, other drug paraphernalia, an iPad, and an iPhone were seized.

Agent Aycocke testified that he spoke to the Defendant at the time of the search and that the Defendant admitted he had been involved in the sale of steroids since 2009, had started with a small enterprise and built it "into something large," had earned a substantial amount of money, and had obtained the steroids for approximately three years

from his then-supplier. Agent Aycocke said that the Defendant reported making more than $50,000 and using the money to invest in the stock market, purchase a vehicle, travel, and start a vending machine business. Agent Aycocke said that the police intercepted one package that contained 2.2 pounds of raw steroid powder and that this amount could have produced 20,000 fifty-milligram tablets, which the Defendant sold for $1.00 to $1.50 each.

Agent Aycocke testified that the pill press recovered from the Defendant's home was electronic and that the Defendant said it produced one tablet per second. Agent Aycocke said that an active ingredient, a binding agent to form the tablet, and coloring were needed to make the tablets and that all three items were found inside the Defendant's home. Agent Aycocke said that the Defendant admitted having the pill press in his home for one week at the time of the search. Agent Aycocke said that during the controlled drug purchases that led to his obtaining a search warrant, the confidential informants bought reddish-purple and yellow tablets without markings, that additional reddish-purple and yellow tablets were found during the search, and that the tablets bought during the controlled drug purchases were made with the pill press found inside the home.

Agent Aycocke testified that a search of the Defendant's iPad showed email correspondence in which the Defendant inquired about the pricing of various types of raw materials used to make steroids, Xanax, and oxycodone. An August 15, 2013 correspondence retrieved from the iPad reflected that the Defendant inquired about the price of a "100-kit," which Agent Aycocke said was a reference to human growth hormone kits. The correspondence also stated that the Defendant had to obtain a shipping address before placing an order because his "last guy" was "bust[ed] by the DEA." A second correspondence showed that the Defendant inquired about the cost and time to manufacture a "die cast" consistent with photographs of yellow tablets attached to the correspondence. Agent Aycocke identified the tablets as steroids. The Defendant's email account received a response from "Pharma Metal" on March 17.

Agent Aycocke identified a photograph retrieved from the Defendant's iPhone and said that the photograph showed digital scales and purplish-red tablets, which Agent Aycocke said were consistent with the steroid tablets obtained during a controlled purchase and found during the search of the home. He said that the tablets were manufactured using the pill press inside the home. Agent Aycocke identified a March 16, 2014 email correspondence to "Biochem China" requesting that the company "also send . . . a price list for all your steroid powders and HGH" and identified various amounts needed. Agent Aycocke said that 1000 grams of steroid powder would produce 20,000 fifty-milligram tablets and had a value of $20,000 to $30,000. Agent Aycocke said that a package was delivered to the Defendant during the search of the home and that the package contained "counterfeit die to produce counterfeit two-milligram" Xanax tablets.

-8-

Agent Aycocke identified a March 16, 2014 email correspondence, inquiring about 1000 labels and hologram stickers for "30 cc plastic bottles." Agent Aycocke stated that he asked the Defendant about the labels and stickers and that the Defendant reported they were to make the product he manufactured look more professional. The Defendant received a response from the vendor on March 17, 2014, discussing the details of the labels and stickers. Agent Aycocke identified a March 16, 2014 email correspondence from "Addey Wang," which stated the price per kilogram for raw alprazolam was $3200. A second March 16, 2014 email correspondence from Addey Wang provided pricing information for "various types of steroids." A March 17, 2014 email correspondence from "Belle Biochem," provided pricing information for raw alprazolam powder and information about sending payment through "Western Union, Money Gram, or Web Money." Additional email correspondence between the Defendant and various vendors were also received as exhibits.

Agent Aycocke identified a handwritten inventory sheet obtained during the search of the Defendant's home and testified that the list showed the substances the Defendant had ready for sale and their respective values. Agent Aycocke said that the total value of all the substances the Defendant had ready for sale was $4000. Agent Aycocke said the Defendant ran this operation like a "professional business" and noted that the Defendant used portions of his proceeds to invest in the stock market and to finance various purchases. Agent Aycocke characterized the Defendant's operation as a criminal enterprise and drug trafficking organization and said the Defendant was involved heavily with importing these substances for his own business and for others throughout the country. Photographs of the pill press, dye packages, and bottles ready for sale were received as exhibits.

On cross-examination, Agent Aycocke testified that the Defendant was home when the search warrant was executed and that the Defendant was cooperative, cordial, and respectful. Agent Aycocke said that the Defendant spoke to him about the steroid operation at the time of the search and about one month afterward and that the Defendant provided information about the people with whom he was involved but refused to discuss family members. Agent Aycocke agreed that stocks and a boat were seized as a result of a civil asset forfeiture proceeding and that the Defendant provided the passcodes to the iPhone and iPad at the time of the search.

Vickie McCroy testified for the defense that she met the Defendant through her niece, Candi Knight, who was the Defendant's fiancée. Ms. McCroy said that Ms. Knight and the Defendant had been in a romantic relationship for five or six years and had a three-year-old daughter. Ms. McCroy said that the Defendant also had an eight-year-old son from a previous relationship. Ms. McCroy said that the Defendant was a good father and that his children loved him.

Ms. McCroy testified that she learned of the steroid operation from the media reports after the Defendant's arrest. She said that the Defendant worked as a manager at a car rental agency at the time of the sentencing hearing. She said that the Defendant had been "the father of the family," had obtained a college degree, and had continually improved himself.

Knox County Juvenile Court Deputy Clerk Linda McGuire testified that her daughter and the Defendant had an eight-year-old son. She said that she had known the Defendant for approximately nine years and that the Defendant was a loving and caring father, who always put his family first. Ms. McGuire said that her daughter and the Defendant had a good relationship and shared parental responsibilities. Ms. McGuire stated that her daughter told her about the Defendant's arrest. Ms. McGuire said that the Defendant's son would be devastated if the Defendant were sentenced to serve his sentence in prison.

The Defendant addressed the trial court. He expressed his remorse for letting his family down and said, "[T]he feeling of not being able to provide for [his] family . . . [was] the worse feeling any parent could ever imagine." He said he promised his children and Ms. Knight that he would never put them through the stress, heartache, and pain again. He noted that his arrest occurred three years before the sentencing hearing and that he had attempted to make memories with his children since his arrest because he did not know what sentence the court would impose. The Defendant became emotional and told the court that his children were the driving force in his life and that he could not imagine the pain they would suffer if he had to serve his sentence.

The Defendant denied threatening to burn anyone's home and said, "That's not in my character." He said that since his arrest, he had "stopped everything" related to steroids and had spent his time obtaining his college degree in business management. He said that he had obtained gainful employment and that he had been promoted to general manager after starting as a clerk. He said that he and his family had been living together in an apartment for approximately eight months.

The Defendant stated that he would never do anything to jeopardize his freedom or his family's well-being again and admitted that he had put his family "through enough." He requested the opportunity to show the trial court that he was "a changed man" who had "learned from these terrible mistakes." He apologized to the court and to the police officers for the time devoted to "matters" with which he should have never been involved.

In determining the Defendant's sentences, the trial court considered the evidence presented at the guilty plea and sentencing hearings, the presentence report, the principles of sentencing, arguments by counsel, the nature and characteristics of the criminal

conduct involved, the principles of judicial diversion, and the Defendant's statement to the court. The court found that the Defendant was a Range I, standard offender based upon his lack of previous convictions.

The trial court found that no mitigating factors applied. *See* T.C.A. § 40-35-113 (2014). The court found that enhancement factor (2) applied. *See id.* § 40-35-114(2) (Supp. 2015) (amended 2017). The court found, based upon the testimony at the sentencing hearing, that the Defendant was the leader in the operation, which involved more than two people. *See id.* ("The Defendant was a leader in the commission of an offense involving two (2) or more actors[.]"). The court found that the Defendant's email correspondence and the manner in which the substances were acquired and distributed showed the Defendant was the leader of the steroid operation. The court placed "great weight" on this factor, noting "the scope and breadth of this enterprise and operation."

Relative to the Defendant's amenability to correction, the trial court initially made no findings but noted that the Defendant attended college, worked, and provided for his children before his arrest. The trial judge stated that although the Defendant was to be commended for obtaining his college degree, working, and providing for his children, the judge was "not really sure" how these things related to the Defendant's amenability for correction. The court found that the Defendant had no criminal history and qualified for judicial diversion.

The trial court found that the Defendant's social history weighed in his favor but that his social history weighed in his favor while the offenses were being committed. The court found that the offenses were not the typical drug offenses in which a defendant's addiction was a central force. The court found that the Defendant's social history was "pretty static." The court made identical findings relative to the Defendant's physical and mental health, noting that each was "intact during [and after] the commission of these offenses."

The trial court found that the determining factors on whether to grant or to deny judicial diversion were the circumstances of the offenses, the deterrence value to the Defendant and to others, and the "interest of the public." Relative to the circumstances of the offense, the court noted that the Defendant had committed multiple counts of sale or delivery of a controlled substance within a drug-free zone, conspiracy to commit money laundering, maintaining a dwelling for purposes of selling or manufacturing a controlled substance, and unlawful possession of a firearm, all of which were committed within a short time period. The court found that the witness testimony and the Defendant's email correspondence showed that "this had been an ongoing operation . . . for a number of years" and that the operation was "of a larger scale" than indicated by the indictments. The court noted the size of the operation and said that this case falls into the same

category as someone who manufactures methamphetamine inside a home. The court stated,

> I will say that . . . possession of the pill press is unusual in the scope of the operation. This is not just manufacturing or creating a substance. I mean, this is the mass production of a substance, of an illegal substance. And that is somewhat mind boggling.

The court noted the children at the daycare facility adjacent to the Defendant's property. The court's focus, however, was the enormity of the operation. The court noted that the presentence report showed that the Defendant forfeited $42,000 from his E*Trade account and a boat valued at $20,000.

Relative to deterrence and the public interest, the trial court found that the Defendant's statement to the court was sincere. The court found, though, that the email correspondence showed that when someone was "caught" by the police, the Defendant went to "great lengths to continue his criminal operation" by "lay[ing] low." The court found that although the Defendant stated the birth of his son changed his life, the son was eight weeks old when the dye for the pill press was delivered. The court found that the operation was beginning to expand after the birth of the Defendant's son. The court found that the interest of the public and deterrence required the court to take the offenses seriously and found that the operation was the largest the court had ever seen.

The trial court commended the Defendant, Ms. Knight, and Ms. McGuire's daughter for the manner in which they co-parented the Defendant's two children but found that the photograph showing the packages of substances the Defendant had ready for sale was taken inside the kitchen of the Defendant's home, where the children lived. The court also found that a photograph of the pill press inside the garage of the home showed a child's Nerf gun nearby. In weighing this evidence, the court considered the Defendant's stating that his priority was to provide and to care for his family. The court determined that the Defendant intended "to not only operate this criminal enterprise for as long as it was feasible, but he was only going to expand it to a greater degree." The court found that "there has to be some accountability and to operate a global operation within the confines of a house that shares a fence with a daycare, it's just mind boggling." The court found that ordering judicial diversion in this case would not serve as a deterrent to anyone. The court denied judicial diversion based upon the circumstances of the offense, the interest of the public, and the deterrence value. The court stated it "shock[ed] the sensibilities of the community" that "this kind of an operation can take place."

In case number C22659, the trial court sentenced the Defendant to serve five years' confinement for both delivery of a controlled substance in a drug-free school zone convictions, three years of which were ordered to be served at 100%. In case number C22685, the court sentenced the Defendant to three years' confinement for sale or delivery of a controlled substance in a drug-free zone. In case number C22684, the court sentenced the Defendant to three years' confinement for sale or delivery of a controlled substance in a drug-free zone. In case number C22683, the court sentenced the Defendant to five years' confinement for conspiracy to commit money laundering, three years' confinement for maintaining a dwelling where controlled substances are used, three years' confinement for both convictions for possession with the intent to manufacture a controlled substance in a drug free zone, which were to be served at 100%, and one year confinement for unlawful possession of a firearm, for an effective five-year sentence. The two counts of possession with the intent to deliver a controlled substance in a drug-free zone were merged into other offenses, and the trial court did not impose sentences. The court declined to order consecutive service in this case. This appeal followed.

## I. Judicial Diversion

The Defendant contends that the trial court abused its discretion by denying his request for judicial diversion. He argues that the court failed to weigh and apply all of the relevant factors in determining whether to grant his request for judicial diversion and that the court relied upon irrelevant factors. The State responds that the trial court properly denied diversion.

A trial court may order judicial diversion for certain qualified defendants who are found guilty of or plead guilty or nolo contendere to a Class C, D, or E felony or a lesser crime; have not previously been convicted of a felony or a Class A misdemeanor; and are not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-313(a)(1)(B)(i) (Supp. 2013) (amended 2014). The grant or denial of judicial diversion is within the discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citing T.C.A. § 40-35-313(a)(1)(A)). When considering whether to grant judicial diversion, a trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the ends of justice. *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *see King*, 432 S.W.3d at 326. "The record must reflect that the court has weighed all of the factors in reaching its determination." *Electroplating*, 990 S.W.2d at 229. If a trial court refuses to grant judicial diversion, "[T]he court should clearly articulate and place in the record the specific reasons for its determinations." *Parker*, 932 S.W.2d at 958-59. "The truthfulness of a defendant, or

lack thereof, is a permissible factor for a trial judge to consider in ruling on a petition for suspended sentence." *State v. Neeley*, 678 S.W.2d 48, 49 (Tenn. 1984).

On review of a decision to grant or deny judicial diversion, this court will apply a presumption of reasonableness if the record reflects that the trial court considered the *Parker* and *Electroplating* factors, specifically identified the relevant factors, and placed on the record the reasons for granting or denying judicial diversion, provided any substantial evidence exists to support the court's decision. *King*, 432 S.W.3d at 327. If, however, the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. *Id.* at 328. Likewise, a trial court's reliance upon an irrelevant factor may result in an abuse of discretion. *See State v. McKim*, 215 S.W.3d 781, 787 (Tenn. 2007). However, a court's sheer consideration of an irrelevant factor does not result in an abuse of discretion because "it is the undue consideration of an irrelevant factor that is prohibited." *Stanton v. State*, 395 S.W.3d 676, 687 n.2, 691 (Tenn. 2013). A "trial court is not required to recite on the record all of the . . . factors; however, the record should reflect that the trial court considered all of the factors in rendering its decision that it 'identified the specific factors applicable to the case before it.'" *State v. Dycus*, 456 S.W.3d 918, 930 (Tenn. 2015) (quoting *King*, 432 S.W.3d at 327.).

The record reflects that the trial court considered each *Electroplating* factor in determining whether to grant or to deny the Defendant's request for judicial diversion. As a result, we review the trial court's determination for an abuse of discretion with a presumption of reasonableness. Although the trial court focused on the circumstances of the offense, the deterrence value, and the public interest in denying diversion, the court nonetheless addressed the remaining *Electroplating* factors. Relative to the Defendant's amenability to correction, the court commended him for obtaining his college degree, obtaining gainful employment, and providing for his family's welfare. Although the court stated that it was unsure whether these activities showed the Defendant was amenable to correction, the court's statements indicate that it gave little weight to this factor when viewed in conjunction with the circumstances of the offense, deterrence, and the public interest. Relative to the Defendant's criminal history, the court only found that the Defendant was eligible for diversion because he had no previous criminal history. The court's finding indicates that this factor weighed in the Defendant's favor but that it gave little weight to this factor, as well. The court also considered the Defendant's social history and physical and mental health. The court found that these factors weighed in the Defendant's favor but noted that his social history had been "pretty static" and that his physical and mental health had been "intact" before and after the offenses, indicating that it, likewise, gave little weight to these factors. *See King*, 432 S.W.3d at 382 (concluding that a defendant's physical and mental health was a neutral factor when the record showed "nothing remarkable" about the defendant's health); *Dycus*, 465 S.W.3d at 931 (reaching the same conclusion based upon *King*).

The trial court's denial of judicial diversion rested upon the remaining *Electroplating* factors. Although the court did not make explicit findings regarding weight, the court's extensive determinations relative to the circumstances of the offense, the deterrence value, and the public interest show that it determined each factor weighed heavily against the Defendant and outweighed any of the favorable factors. Relative to the circumstances of the offenses, the court determined that the testimony and the Defendant's email correspondence showed that the steroid operation had been ongoing for a number of years and was a much larger enterprise than indicated in the indictments. The court emphasized the size of the operation multiple times and noted that the Defendant's obtaining a pill press showed that the operation was not solely rooted in distribution but rather in an intent to manufacture and to engage in mass production of controlled substances. The court also emphasized that the amount of money and assets seized from the Defendant showed the enormity of the operation.

Relative to the deterrence value and the public interest, the trial court determined that although the Defendant was sincere during his allocution, the Defendant went to great lengths to continue his operation by "laying low" when someone involved in the operation became entangled with law enforcement. The court noted that the Defendant had taken efforts near the time of his arrest to expand his operation by obtaining materials to manufacture professional-looking controlled substances. The court determined that the Defendant ran a global operation, and the record supports this finding to the extent that the Defendant obtained his materials from China. The court noted that the Defendant's home adjoined the property of a daycare facility and stated that it "shock[ed] the sensibilities of the community" that "this kind of an operation can take place." The court determined that judicial diversion in this case would not serve the public interest or provide a deterrent to anyone. Although the trial court's determination that the facts of this case were in the same category as someone who manufactured methamphetamine inside a home was not supported by any proof in the record, deterrence and the public interest were proper factors for the court to consider. We conclude that substantial evidence exists supporting the court's denial of judicial diversion and that the court did not abuse its discretion. The Defendant is not entitled to relief on this basis.

## II & III. Discovery & Confidential Informant Testimony

The Defendant contends that the trial court erred by permitting the confidential informants to testify at the sentencing hearing. He argues that the State violated discovery rules by not disclosing their identities and by not providing information relative to law enforcement's investigation of Mr. McGhee that could have been favorable to the defense and for impeachment purposes. The Defendant argues the defense was prejudiced by the failure to disclose their identities because the trial court placed great weight on each informant's testimony. The State responds that the court did not err by permitting the witnesses to testify.

The indictments charging the Defendant in these cases do not reflect the names of the confidential informants who testified at the sentencing hearing. However, each indictment reflects "CI" as a witness to be summoned for the State. The Defendant filed his motion for discovery on March 17, 2015, which included requests for the names, addresses, and telephone numbers of all of the prosecution witnesses and for information of any implied or expressed agreements, understandings, or promises between the State and any of its witnesses. Subsequent discovery requests were filed on October 12, 2015, and January 22, 2016. On June 20, 2016, the Defendant filed a motion requesting that the trial court compel the prosecution to disclose the names and contact information of the confidential informants, arguing that the confidential informants' testimony was material evidence and that disclosure was necessary for a fair trial. However, the record does not reflect that a motion hearing was held or that the trial court ruled on the motion. The Defendant pleaded guilty on September 1, 2016.

At the sentencing hearing, the defense objected to Mr. McGhee's testifying. Counsel stated that the prosecutor told counsel the previous day that Mr. McGhee would be a witness for the State and that counsel understood Mr. McGhee was an informant in a portion of the case numbers. Counsel said that he filed discovery motions and argued that although discovery rules applied to the sentencing hearing, Mr. McGhee had never been formally listed as a witness in relation to any of the indictments. Counsel said that based upon previous cases relying on confidential informant testimony, he believed Mr. McGhee had been given "consideration" or leniency in exchange for testimony and cooperation with the police. Counsel said that he had not received any relevant information and that such information was discoverable based upon the rules of criminal procedure and *Brady v. Maryland*, 373 U.S. 83 (1963). Counsel said that he did not want to delay the hearing and was ready to go forward but that he objected to Mr. McGhee's testimony.

The prosecutor stated that "CI" was listed on the indictments and that "this matter was pled before we proceeded to trial . . . and certainly that is a great basis for cross-examination." He said that he would elicit testimony from Mr. McGhee and Agent Aycocke regarding the consideration Mr. McGhee received from the State. Counsel interjected that he previously filed a motion for disclosure of the confidential informants' identities. Counsel conceded the motion was never addressed "based on the fact that guilty pleas were entered and we were proceeding to a sentencing hearing." Counsel argued, though, that the information existed and that he was entitled to receive "it in advance of the discovery process with meaningful time to prepare . . . rather than hear it the first time during the sentencing hearing." The prosecutor responded that the Defendant pleaded guilty and that "we've waived any motions that could have been raised beforehand pretrial." Counsel stated that "[t]here's still a discovery obligation that continues through sentencing."

The trial court reviewed counsel's motion to compel disclosure of the identities of the confidential informants and the obligations of discovery. An off-the-record and in-chambers discussion was held, and when the proceedings resumed, the trial judge stated the following:

> So, there was an issue about whether discovery applies to the sentencing hearing. [Counsel's] provided a case. There's been a discussion between Counsel and the Court and basically the direction which we have decided to go at this point is [the prosecutor] is going to be calling Agent Aycocke to give some preliminary testimony out of order relating to potentially [Mr. McGhee and Mr. Spelce].

The prosecutor confirmed, and the court asked counsel if he wanted to add anything to the record. Counsel stated, "That's my understanding, Your Honor." Agent Aycocke provided limited testimony about how the confidential informants came to cooperate with the police. Afterward, counsel noted that based upon the agent's testimony, a "case file, video, other information relating to the controlled buys" involving Mr. McGhee existed and argued that he should have been permitted to review them. The prosecutor responded that a motion to review the underlying materials upon which a search warrant relied was "inappropriate for this matter" and that this was "delving into the realm of *Franks*." The prosecutor argued that the officer testified about the basis for his investigation and the Defendant's charges and that the Agent's case file and video recordings of the controlled purchases from the informants were irrelevant "to the matter at hand, particularly after the Defendant's guilty plea[.]" Counsel responded that if the confidential informants were only being utilized to establish probable cause for the search warrant, counsel would have agreed that the case file and video recordings should remain confidential. Counsel argued, though, that the State was offering Mr. McGhee as a witness at the sentencing hearing, making his credibility an issue. Counsel said that his focus was the agent's case notes and that he believed the notes were discoverable if the State intended to present Mr. McGhee as a witness.

The prosecutor argued that use of the case notes was "classic collateral evidence being used to . . . impeach a witness" and that this was "clearly outside the rules of evidence." Counsel asserted that although the State had conceded Mr. McGhee received consideration for his testimony, the defense should have been able to review the case notes because "it's potentially impeachment material." The trial court questioned what relevant information the notes could contain beyond that the police video recorded Mr. McGhee during two controlled purchases and that the police did not prosecute Mr. McGhee in exchange for his work in the cases against the Defendant. Counsel said it was possible the case notes did not contain any additional relevant information but that counsel was doing his "due diligence."

The trial court clarified that the defense only wanted to review Agent Aycocke's case file relative to the two controlled purchases before Mr. McGhee began working as a confidential informant, and counsel agreed. The court determined that this information was not directly relevant to the Defendant's sentencing hearing and would have been outside the scope of the testimony. The court reserved the right to request that the materials be received as a late-filed exhibit, but the record does not reflect this was done.

A bench conference was held before Mr. Spelce testified in which the defense objected to the testimony on the "same discovery objection, but not the case file." The bench conference ended, and Mr. Spelce's testimony began. The court requested a second bench conference to clarify what materials counsel thought were discoverable, and counsel stated, "There were notes provided, absolutely." The record does not reflect the issue was addressed again.

We glean from the record that the defense objected generally to both confidential informants testifying at the sentencing hearing because the State did not disclose their identities during the discovery process. We also determine that the defense objected specifically to Mr. McGhee's testimony because the State failed to provide information from Agent Aycocke's case file about the controlled drug purchases leading to Mr. McGhee's working as an informant.

As a preliminary matter, we note that the rules of discovery apply to sentencing hearings. *State v. Cottrell*, 868 S.W.2d 673, 677 (Tenn. Crim. App. 1992); *see State v. Buck*, 670 S.W.2d 600, 606 (Tenn. 1984); *see also State v. Max Eugene Martin*, No. 01C01-9609-CR-00415, 1998 WL 188856, at *2 (Tenn. Crim. App. Apr. 20, 1998) (determining that compliance with the rules of discovery at a sentencing hearing is required after a defendant pleads guilty), *perm. app. denied* (Tenn. Dec. 7, 1998). Therefore, we disagree with the notion that the Defendant's guilty pleas waived compliance with the rules of discovery at the sentencing hearing.

Tennessee Criminal Procedure Rule 16 addresses the parties' rights and obligations during the discovery process. Rule 16 requires the State, upon request, to disclose certain evidence to the defense. *See* Tenn. R. Crim. P. 16(a)(1). The information subject to disclosure by the State includes a defendant's oral, written, and recorded statements, codefendant's statements, a defendant's previous criminal history, documents and objects, and reports of examinations and tests. Tenn. R. Crim. P. 16(a)(1)(A)-(G). However, disclosure of the identity of confidential informants is not required by Rule 16. *See State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992) (stating "Rule 16 . . . does not require nor authorize pretrial discovery of the names and addresses of the State's witnesses"); *State v. Martin*, 634 S.W.2d 639, 643 (Tenn. Crim. App. 1982). To the extent that the Defendant asserts that the State violated the rules of discovery by not

identifying the confidential informants, we conclude that the Defendant is not entitled to relief on this basis.

Tennessee Code Annotated section 40-17-106 (2012) states that "[i]t is the duty of the district attorney general to endorse on each indictment . . . the names of the witnesses as the district attorney general intends shall be summoned in the cause[.]" The purpose of this provision is to prevent unfair surprise to the defense, but the duty is directory, not mandatory, and the failure to provide a witness' name on the indictment does not automatically prevent the witness from testifying at a later time. *Harris*, 839 S.W.2d at 69; *see State v. Allen*, 976 S.W.2d 661 (Tenn. Crim. App. 1997). In the present case, "CI" appeared on the face of the indictment, providing notice to the Defendant that a confidential informant could testify against the Defendant. The State complied with its statutory directive.

"Tennessee common law recognizes the government's privilege, subject to certain limitations, to withhold from the accused the identity of a confidential informant." *House v. State*, 44 S.W.3d 508, 512 (Tenn. 2001); *see Roviaro v United States*, 353 U.S. 53, 59-91 (1957); *State v. Vanderford*, 980 S.W.2d 390, 395 (Tenn. 1997) (Generally, "the identity of a confidential informant is privileged."); *Simmons v. State*, 281 S.W.2d 487 (Tenn. 1955). The privilege, though, "is not absolute," and its scope "is limited by its underlying purposes." *Vanderford*, 980 S.W.2d at 396; *see Roviaro*, 353 U.S. at 60. A defendant has the burden of showing by a preponderance of the evidence that the informant's identity is material to the defense because "the informant was a participant in the crime," "the informant was a witness to the crime," or "the informant has knowledge which is favorable to the defendant." *Vanderford*, 980 S.W.2d at 397. A court's decision whether to require disclosure "is left to the discretion of the trial court." *House*, 44 S.W.3d at 512; *see Wallis v. State*, 417 S.W.2d 781, 784 (Tenn. 1967).

In the present case, each indictment reflects that a "CI" was a potential witness for the State. The defense filed a motion to compel the prosecution to provide the identities of the informants. However, the record reflects, and the Defendant conceded at the sentencing hearing, that the motion was never addressed. Counsel nonetheless objected to the informant's testifying at the sentencing hearing. An off-the-record and in-chambers discussion was held, and when the proceedings resumed the trial court stated, in relevant part, "There's been a discussion between Counsel and the Court and basically the direction which we have decided to go at this point is [the prosecutor] is going to be calling Agent Aycocke to give some preliminary testimony . . . relating to [Mr. McGhee and Mr. Spelce]." Based upon the court's statement, it is unclear what transpired during the in-chambers discussion relative to the motion to compel disclosure of the informants' identities or to the defense's objection to the informants testifying at the sentencing hearing. It appears, minimally, that the motion to compel was abandoned because the record does not reflect any objections to the court's procedure. To the extent that the

Defendant argues that the trial court erred by denying his motion to compel disclosure, we conclude that the issue is waived. *See* T.R.A.P 36(a) ("[R]elief may not be granted in contravention of the province of the tier of fact. Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

The defense's basis for objecting to the confidential informants' testimony at the sentencing hearing was the alleged discovery violation for not disclosing their identities. However, we have already concluded that failure to disclose their identities did not violate the rules of discovery, and as a result, the remedies provided in Rule 16 governing discovery violations, which includes suppression of the undisclosed evidence and a continuance to review the evidence, do not apply in this case. *See* Tenn. R. Crim. P. 16(d)(2)(C). We note that counsel did not want to delay the hearing. The Defendant is not entitled to relief on this basis.

Regarding Agent Aycocke's case file related to Mr. McGhee, the Defendant asserts that the materials "would have contained exculpatory information, given the fact that he received consideration for his cooperation as a confidential informant and never charged with any crimes." The Defendant argues that failure to provide Agent Aycocke's case file to the defense violated the rules of discovery and *Brady*. The Defendant argues that the consideration Mr. McGhee received from the police was favorable to the defense for impeachment purposes and that the Defendant would have received judicial diversion if this information had been available for cross-examination.

The record reflects that Agent Aycocke's investigation included conducting two controlled purchases from Mr. McGhee, who later became a confidential informant for the police. Agent Aycocke testified that he told Mr. McGhee about the two controlled drug purchases, that Agent Aycocke asked for Mr. McGhee's cooperation with the police investigation of the Defendant, and that Mr. McGhee agreed to cooperate. Agent Aycocke said that Mr. McGhee was never charged with a criminal offense because Mr. McGhee was not a distributor of steroids but was "[m]ore of a sharer." Based upon this testimony, the defense argued it should have been permitted to review Agent Aycocke's case file, although counsel's focus was the notes contained in the file.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

In order to show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390); *see State v. Edgin*, 902 S.W.2d 387, 391 (Tenn. 1995) (op. on pet. for reh'g).

Evidence that provides value for impeachment of a state's witness is within the purview of *Brady*. *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014); *see also United States v. Bagley*, 473 U.S. 667, 767 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The critical inquiry remains, though, whether the evidence was material.

In *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), the Supreme Court observed:

[The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

(quoting *Bagley*, 473 U.S. at 678); *see Jackson*, 444 S.W.3d at 595.

The record does not reflect that the defense alleged in the trial court proceedings that the State violated *Brady* by not providing the contents of Agent Aycocke's case file to the defense. Appellate review of an issue raised for the first time on appeal is waived. *See* T.R.A.P. 36(a); *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996). Furthermore, the trial court did not address any allegations or render any findings of fact and conclusions of law relative to *Brady*. *See* T.R.A.P 36(a).

In any event, Agent Aycocke and Mr. McGhee each testified that Mr. McGhee was never charged with a criminal offense in exchange for his cooperation with the police, although Mr. McGhee was never promised the State would decline to prosecute. Thus, the evidence of consideration provided to Mr. McGhee and his credibility were before the trial court. Counsel argued at the hearing that he wanted to review the case notes because they contained "potentially impeachment material." We note that Agent

-21-

Aycocke's case notes are not included in the appellate record, and we will not speculate what the notes reflect. When the court questioned whether the case notes contained relevant impeachment evidence beyond that the file contained video recordings of Mr. McGhee during two controlled purchases and that the police did not prosecute Mr. McGhee in exchange for his work in the case against the Defendant, counsel conceded the possibility that the notes did not contain relevant information. We note that the defense cross-examined Mr. McGhee extensively at the hearing. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE